[773 NYS2d 354]

Peter Gross et al., Respondents, v Empire State Building Associates et al., Appellants.

First Department, March 2, 2004

**APPEARANCES OF COUNSEL**

*Sullivan, Papain, Block, McGrath & Cannavo, P.C. (Stephen C. Glasser, Cyrus M. Diamond* and *Stewart G. Milch* of counsel), for *Peter Gross* and others, respondents.

*Allegaert Berger & Vogel LLP (Michael S. Vogel* and *Ronald Busloff* of counsel), for *Jakob Schaad*, respondent.

*Lester Schwab Katz & Dwyer, LLP (Steven B. Prystowsky* of counsel), for appellants.

### OPINION OF THE COURT

ANDRIAS, J.

We live in an uncertain and sometimes unpredictable world seemingly filled with daily reports of random acts of violence, including bombings, shootings and mayhem on our public streets, in work sites, post offices, fast food restaurants, federal office buildings, schools, subways and commuter trains and, of course, the World Trade Center. Particularly in the aftermath of the attacks on September 11, 2001, we encounter metal detectors, bag checks and numerous other security measures at airports, sports stadiums, government buildings and countless other venues. Security has become a pervasive aspect of everyday life.

Nevertheless, landlords—in this case the landlords of the Empire State Building—have a firmly established common-law duty to take only "minimal precautions" to protect tenants and visitors from foreseeable harm, including foreseeable criminal acts (*Mason v U.E.S.S. Leasing Corp.*, 96 NY2d 875, 878 [2001]). As recognized by the IAS court, landlords are not insurers of the safety of those who use their premises and, even with a history of crime committed on the premises, cannot be held to a duty to take protective measures unless it is shown that they know or, from past experience, have reason to know that there is a likelihood of conduct, criminal or otherwise, likely to endanger the safety of those using their premises. "The question of the scope of an alleged tort-feasor's duty is, in the first instance, a legal issue for the court to resolve" (*Williams v Citibank*, 247 AD2d 49, 51-52 [1998], *lv denied* 92 NY2d 815 [1998]).

The IAS court properly found that defendants clearly have shown that significant precautions were undertaken by them in light of undisputed evidence that defendants, among numerous other measures, had installed a million dollar closed circuit television surveillance system in the public areas of the Empire State Building, posted signs that all persons entering the building were subject to a search of packages and bags, employed a large security force and conducted random bag checks. It also found, again correctly, that as of Sunday afternoon, February 23, 1997, the day of this incident, there had been only a minimal

amount of actual violent criminal activity within the Empire State Building, particularly the observation decks which attract 10,000 visitors each day and another 25,000 on weekends. That afternoon, a deranged man in his late 60s, armed with a semi-automatic Beretta pistol he purchased in Florida, went to the 86th floor observation deck of the building and, suddenly and without warning, indiscriminately shot at the large crowd of people, killing Christoffer Burmeister, a Swiss tourist, and seriously injuring six others before committing suicide with the same pistol.

Nonetheless, despite evidence that there had never been a shooting in the 65-year history of the building and only two muggings or assaults from January 1995 to 1997, the court found that violent criminal activity, essentially robberies, in the building's ground level retail stores and on the abutting sidewalks, combined with 20 bomb threats to the building, raise a factual issue as to foreseeability. We disagree.

Obviously, with the benefit of 20-20 hindsight, everything is foreseeable. However, without reciting a litany of cases on either side of the issue, it simply cannot be said that in 1997, when, as defendants aptly note, metal detectors were much less prevalent than today,* the Empire State Building and its landlords could reasonably have foreseen the events of February 23, 1997 and be held to the duty urged by plaintiffs, namely the use of x-ray machines, metal detectors and scanners together with armed security guards and the inspection of all bags and packages. Nor is there any evidence that the assailant appeared in any way out of the ordinary or acted suspiciously right up to the moment he pulled out the pistol and began shooting.

Accordingly, the order of the Supreme Court, New York County (Edward Lehner, J.), entered February 24, 2003, which denied defendants' motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, defendants' motion granted and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

NARDELLI, J.P., MAZZARELLI, SULLIVAN and LERNER, JJ., concur.

Order, Supreme Court, New York County, entered February 24, 2003, reversed, on the law, without costs, defendants' motion for summary judgment granted and the complaint dis-

---

* They were then limited to a handful of government buildings such as the United Nations, City Hall, some courthouses, and the Statue of Liberty.

missed. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.