■ JAMES WYATT et al., Appellants, v STATE OF NEW YORK, Respondent.—Judgments, Court of Claims, entered July 10, 1990, which, after a bifurcated nonjury trial (before Adolph C. Orlando, J.), on the issue of liability, dismissed the claimants' claims against the State of New York, reversed, on the law and the facts, liability on the part of the State of New York is found, judgment is directed to be entered in favor of claimants on the issue of liability and the matter is remanded to the Court of Claims for a trial on the issue of damages, without costs.

On March 21, 1986, as the result of a traffic dispute, claimants were shot and wounded by an off-duty correction officer, Kenneth Robinson, employed by the New York State Department of Correctional Services at its Taconic Correctional Facility (referred to throughout the trial as the "Correction" Department).

Both claimants testified that they did not strike or hit the officer in any way but were merely talking to him and that the officer who seemed agitated shot them without warning. Claimant Plunkett testified that as he lay on the ground wounded, Robinson, gun in hand, came over and kicked him in the head. The officer testified that claimants pulled him out of his car by the hair and, although he showed his correction officer's shield, they punched him for approximately seven to eight minutes before he drew his revolver and fired two warning shots before shooting each claimant at a range of approximately four feet, one in the hip and one in the abdomen.

The officer was arrested, his gun was confiscated and he was taken to the hospital, where, despite his claim of having been beaten, no bruises were found on his body and his clothing was intact, the only noticeable injury being a contusion of the right foot. Although the officer was immediately suspended from his employment, and he testified twice before a Grand Jury, no departmental or criminal charges resulted.

Less than two years earlier, on April 14, 1984, while off-duty

on unpaid sick leave, the officer shot Princess, a small mixed breed puppy he encountered while walking on crutches on a Bronx street at about 2:00 A.M. The dog, a family pet, apparently was barking and running loose in the parking lot of a funeral home, its owner's business.

The dog's owner, Hector Marquez, was not present at the time, but when he was told by his nephew that Princess had been shot, he called 911 and then went after Robinson who had continued walking. When he confronted the officer and asked "why did you shoot the dog?", Robinson responded "I going shoot you, too." The owner backed away and the police arrived in several minutes, but did not arrest Robinson after he showed them his correction officer's badge.

Mr. Marquez testified that he telephoned the Correction Department and told them that Robinson had threatened him and his nephew and was acting "[i]n a crazy way." He was told that the Department would investigate. Approximately two years later, he received a telephone call from the Correction Department and related the incident again.

Despite Mr. Marquez's complaint, the Department of Correctional Services failed to investigate the matter until 1½ years later, at which time the matter was closed without any findings or disciplinary action being taken against the officer, the Department apparently accepting without further inquiry Officer Robinson's claim that he thought the dog was about to attack him.

The trial court found that such investigation was not thorough, but concluded that the fact that the Department did not pursue a more exhaustive and extensive investigation of the incident does not in any way indicate that the officer was incompetent, dangerous or otherwise emotionally unstable. Hence, the court concluded, although the prior discharge of the weapon was clearly excessive and the Department of Correctional Services could have been more stringent in its investigation and requirements, it could not have prevented the shooting incident underlying these claims.

However, the question is not whether the subject incident could have been prevented as such, but whether the Department was negligent in failing to thoroughly investigate the prior incident or take any remedial action and whether such negligence was a proximate cause of claimants' injuries?

The Department of Correctional Services does not require or even desire its off-duty peace officers to carry firearms. Those employees who enjoy peace officer status and elect, for per-

sonal reasons, to carry firearms while off-duty must do so in accordance with departmental rules. Those rules specify that an officer on unpaid leave for personal or health reasons loses his or her peace officer status during such leaves and may not carry a firearm possessed by virtue of such status.

Three days after he shot Princess, Officer Robinson was so notified in writing. Nevertheless, despite a clear violation of its rules, the Department of Correctional Services took no disciplinary action, which its Deputy Inspector General testified would have included confiscating the officer's weapon pending investigation and, if the charges were sustained, other sanctions, including prohibiting him from carrying a weapon while off-duty. She testified that she knew of no instance where an officer involved in an off-duty shooting incident in which an individual was injured was returned to duty without a complete investigation.

Where, from the particular circumstances presented, it is reasonable for a public employer to conclude that the retention of an employee may involve a known risk of bodily harm to others, the agency's discretion is limited and superseded by its duty to abate that risk if in related circumstances danger to others is reasonably to be foreseen (McCrink v City of New York, 296 NY 99, 106).

It goes without saying, that if the Department's investigation had found that the officer's 1984 shooting of the dog was unjustified, the officer could possibly have been suspended or removed from his position. At the very least, as is evident from the testimony of the Department's Deputy Inspector General, his right to carry a weapon while off-duty would have been revoked. Regardless of any finding of fault, which could have resulted in the misdemeanor charge of unjustifiably injuring or killing an animal (Agriculture and Markets Law § 353), the record is clear that the officer violated departmental regulations by carrying an unlicensed firearm while on unpaid sick leave.

In light of the officer's demonstrated propensity to react violently and fire his weapon in a non-criminal and non-violent street confrontation, the Department's failure to restrict or revoke his carrying of a firearm or at the very least to evaluate him psychologically and provide him with special training or counselling must be deemed negligent under the circumstances presented. Where the Department of Correctional Services made no meaningful effort to comply with its own rules and policies, such omission cannot be cured by later

supposition that, had a proper investigation been made of the 1984 incident, the employee's status would have remained unchanged. *(See, Haddock v City of New York,* 75 NY2d 478, 485.)* In any event, the Trial Judge dismissed for legal insufficiency and, under the circumstances, this was clearly error.

As an afterthought, the dissent cites the recent Court of Appeals decision in *Mon v City of New York* (78 NY2d 309). The case is not applicable because our determination is based on the failure of the State Department of Correctional Services to exercise any discretion and simply to slough off the issue. Concur—Sullivan, J. P., Rosenberger and Kupferman, JJ.

Smith and Rubin, JJ., dissent in a memorandum by Rubin, J., as follows: On March 21, 1986, Kenneth Robinson, an off-duty correction officer, shot and wounded claimants following a traffic dispute. Two years previously, on April 14, 1984, while walking with the aid of crutches with his leg in a cast sometime after 2:00 A.M., Robinson shot and injured a dog, described by the owner as a "mixed German Shepherd" about 1½-years-old. Robinson alleged that the dog charged towards him as if to attack. The dog's owner filed a complaint with the Police Department and the Correction Department, alleging that the shooting of the dog was unjustified and that Robinson had threatened to shoot him as well. Robinson notified the Correction Department that he had discharged his weapon. An unusual incident report was completed, which notes that Robinson's statements concerning the episode were verified with officers of the 40th Precinct who had responded and investigated. The Department closed its investigation on June 25, 1984. Aside from this incident, Robinson's employment record indicates merely excessive lateness and absence, two incidents of leaving his post without permission and one incident of insubordination.

In these personal injury actions, claimants argued that the State breached its duty of due care in hiring and training Robinson by failing to implement psychological screening procedures prior to the time the Department considered Robinson for appointment as a correction officer. The Court of Claims found that claimants failed to prove that the State was negligent.

Upon this appeal, claimants contend that the findings of the Trial Judge are against the weight of the evidence. However, a judgment in favor of a defendant will not be set aside "unless the evidence preponderated so greatly in plaintiff's favor that the [trier of fact] could not have reached its

conclusion on any fair interpretation of the evidence" *(Pertof-sky v Drucks,* 16 AD2d 690). The preponderance of the credible evidence adduced at trial does not establish a breach of duty by the State. The evidence in support of claimants' allegation consists of the vague testimony of their expert clinical psychologist, who testified only that "most agencies"—or at least a "significant" number—had adopted certain psychological screening and evaluation techniques by the time Robinson was hired. "The credibility of an interested witness, and the truthfulness and accuracy of his testimony, whether contradicted or not, are matters exclusively for the * * * triers of the facts" *(supra).* In addition, the record is devoid of evidence that the State, at the time of hiring, had any knowledge of Robinson's propensity for the type of behavior which resulted in injury to claimants. It should be noted also that the record fails to indicate that a psychological evaluation, had one been conducted, would necessarily have revealed that the officer was so unstable as to disqualify him from employment by the Department.

Claimants' contention that the State breached its duty to properly train Robinson is likewise refuted by the record, which indicates that he successfully completed the Department's six-week basic training course. In addition, claimants have failed to indicate in what way additional training would have prevented the violence which erupted following the traffic altercation. Similarly, claimants have failed to demonstrate that the State failed to use reasonable care to "refrain from knowingly retaining in its employ a person with known dangerous propensities in a position that would present a foreseeable risk of harm to others" *(Haddock v City of New York,* 140 AD2d 91, 94, *affd* 75 NY2d 478). That the Department accepted Robinson's version of the shooting of the dog represents merely its assessment of his credibility and does not denote negligence. Likewise, while the Department's failure to conduct a more thorough investigation might reflect a certain insensitivity to the feelings of the dog's owner, the situation is hardly analogous to an incident in which a human being is the target in a shooting. Finally, while the Department's failure to sanction Robinson for carrying his firearm while on sick leave may indicate some unevenness in the enforcement of departmental regulations, it is quite irrelevant to the issue at hand. The unauthorized possession of a weapon does not invariably indicate a propensity for violence on the part of the person carrying it.

The majority attempt to impose liability on the State based

not upon what the Correction Department actually knew about Robinson at the time of his assault on plaintiffs, but upon what might have been discovered had circumstances been different. *If* the Department had established psychological screening and evaluation of candidates prior to the time Robinson was hired, *if* the screening procedures were sufficiently effective to reveal his propensity for violence, *if* Robinson had not been hired or had been suspended based upon the results of his evaluation, *if* he had remained on suspension at the time of the altercation with plaintiffs, then their injuries might have been avoided. Similarly, *if* the Department had regarded the April 1984 shooting of the dog as indicative of Robinson's propensity to act violently towards humans, *if* the Department had investigated the incident more thoroughly, *if* the departmental investigation had resulted in the suspension of Robinson's employment or his privilege of carrying an off-duty weapon and *if* the suspension had remained in effect two years later when the altercation with claimants occurred, then, again, claimants' injuries might have been avoided. However, the evidence simply does not suggest that the Department became aware of any dangerous propensity exhibited by Robinson so as to put the State on notice that he represented a threat to the public.

Accordingly, I conclude that claimants have failed to establish that the findings of the Trial Judge were against the weight of the evidence. Moreover, while the argument was not advanced on appeal, it appears that some or all of the acts asserted to constitute negligence in the hiring and retention of the correction officer involve the exercise of discretion and are therefore within the State's governmental immunity *(Mon v City of New York,* 78 NY2d 309).